IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of<br><br>K.B. | No. 87433-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, C.J. — K.B. appeals from the order that committed her to 14 days of involuntary mental health treatment and avers that the State did not present sufficient evidence to support the court's finding that she was gravely disabled. We disagree and affirm.

FACTS

On October 30, 2024, K.B. arrived at the University of Washington Medical Center Montlake emergency room "via ambulance after refusing to get off a city bus." Upon assessment at the hospital, K.B. indicated she was seeking "hot water for instant noodles and assessment of toe fungus," but did not describe the incident on the bus or explain why she refused to leave it. K.B. was evaluated by a licensed independent clinical social worker and by a designated crisis responder (DCR).

The DCR filed a petition for initial detention under the involuntary treatment act[1] (ITA) later that day, which included a declaration from the social worker. The petition stated that K.B. had two previous involuntary commitments, most recently

---

[1] Ch. 71.05 RCW.

in August 2024. It alleged that K.B. "suffer[ed] from a behavioral health disorder characterized by impaired insight, impaired judgement [sic], impaired impulse control, increased aggression, disorganized speech[,] and threatening to kill a nurse." The petition further described observations by staff, specifically that K.B. was "responding to internal stimuli; yelling at the wall as if there was another person there." The petition also stated that K.B. "was not cooperative with medical staff and attempted to spit [on] and kick a nurse." During the DCR's evaluation, K.B. displayed "disorganized and nonsensical thought." K.B. "denied having made threats to harm a nurse," but when asked about it, K.B. "became emotionally escalated." The social worker's supporting declaration stated that K.B. "exhibit[ed] evidence of a mental disorder including with diagnosis of Bipolar Disorder with symptoms of mania including delusions, hallucinations, responding to internal stimuli, and hypersexual behavior." K.B. also repeatedly "exposed herself" to the social worker and other staff. The petition concluded that as "a result of a behavioral health disorder," K.B. was "at imminent risk of physical harm due to being gravely disabled and is a danger to others" which necessitated "involuntary hospitalization for further evaluation, treatment[,] and stabilization." K.B. was transported to Fairfax Hospital, pursuant to the custody authorization that followed the initial petition.

Laura Yen, a licensed independent clinical social worker and court evaluator at Fairfax, filed a petition for 14 days of involuntary treatment under the ITA a few days later. The 14-day petition also contended that K.B. presented a "likelihood of serious harm to others" and was "gravely disabled" because, as a result of her

"mental disorder," she was "in danger of serious physical harm resulting from a failure or inability to provide for [her] essential human needs of health or safety and/or manifests severe deterioration in routine functioning." The 14-day petition reiterated allegations from the initial petition and added that at Fairfax, K.B. was "agitated, disorganized, dysphoric, irritable[,] and restless[,] with poor hygiene and untreated headlice." It further noted that at the time the petition was filed, K.B. was "showing increased loss of cognitive and volitional functioning" and "poor insight regarding symptoms" such that continued hospitalization was "essential."

On November 20, the trial court held a probable cause hearing on the 14-day petition. The State called Joseph Cisneros, a court evaluator for the University of Washington, and Yen as witnesses. Cisneros read from a "discharge mental status exam" that described K.B.'s affect and behavior at the end of a previous period of treatment in August 2024. Her behavior was "noted as being cooperative with good eye contact, mood as good, thought content with no auditory or visual hallucinations." K.B. was "alert and oriented," her memory was "grossly intact," and her "insight [wa]s good." However, while she acknowledged "having mental health issues," she still exhibited a "rambling speech pattern" at the time of that discharge from care. Cisneros also reiterated and expanded on allegations from the initial petition. On cross-examination, he also noted that K.B. had tested positive for "amphetamines and methamphetamines" while in the emergency room.

Yen testified to her own evaluation of K.B. and read from medical records generated during K.B.'s hospitalization at Fairfax. Yen opined that K.B. suffered

- 3 -

from "bipolar disorder, manic with psychotic features" as evinced by symptoms including "delusional content" with "some auditory hallucinations." Yen said K.B. was "hyperverbal with loud, pressured speech" and both displayed "difficulty with impulse control" and instigated "some aggressive behavior." Yen stated it was her opinion that K.B.'s mental disorder put her in danger of serious physical harm and K.B. also showed severe deterioration which suggested she would not receive essential care outside the hospital.

K.B. also testified on her own behalf. She explained that she believed she had a mental health disorder that required treatment and medication. She also stated that she knew of several different shelters available to her upon discharge and friends that she could stay with. K.B. admitted that she was unable to refill her prescriptions when she ran out of her medications. She explained that because her phone had been stolen, she was unable to navigate to reach appointments, and it was difficult to follow up with doctors and refill her prescriptions, so she stopped taking them. She stated that she was on a waitlist for subsidized housing and had plans to get new identification and a phone.

After testimony and closing argument, the trial court issued its oral ruling and, later, entered findings of fact, conclusions of law, and an order committing K.B. for 14 days of involuntary treatment. It concluded that the State had proven by a preponderance of the evidence that K.B. suffered from a mental disorder such that she was gravely disabled and there was "sufficient evidence [t]here of a decline in baseline function since" K.B.'s discharge from a previous round of treatment. It did not find she was a risk to others. It also found that K.B.'s

- 4 -

"testimony regarding her ability to function in the community" was "not persuasive" because, even if she had knowledge of the shelters available to her, she previously had difficulty in securing and maintaining access to those resources. The trial court further found that less restrictive alternative treatment was not in K.B.'s best interest.

K.B. timely appealed.

ANALYSIS

As a threshold matter, K.B. avers that even though the 14-day commitment has concluded, the issue she presents on appeal is not moot because "she still faces collateral consequences from the commitment order." The State appropriately concedes that point in its response brief. We agree and reach the merits.

I.      Sufficiency of the Evidence

K.B.'s briefing on appeal contends that although she does suffer from bipolar disorder, "she is also unhoused, has struggled with substance use, and had difficulty utilizing services in the past because her phone and ID were stolen." She avers that "the evidence does not prove that [K.B.]'s alleged loss of cognitive control and alleged inability to continue receiving treatment was 'a result of her behavior health disorder' and not a result of external factors." (Emphasis omitted). The State's response brief counters that substantial evidence supported the trial court's determination regarding the need for involuntary treatment because it had established K.B.'s baseline and "deterioration from that baseline," her inability to

make rational decisions about her treatment needs, and that her bipolar disorder prevented her from accessing resources and "avoiding additional decompensation."

Where, as here, "the trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the findings, and, if so, whether the findings in turn support the trial court's conclusions of law and judgment." *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). "'Substantial evidence is evidence that is in sufficient quantum to persuade a fair-minded person of the truth of the declared premise.'" *In re Det. of T.C.*, 11 Wn. App. 2d 51, 56, 450 P.3d 1230 (2019) (internal quotation marks omitted) (quoting *In re Det. of A.S.*, 91 Wn. App. 146, 162, 955 P.2d 836 (1998), *aff'd*, 138 Wn.2d 898, 982 P.2d 1156 (1999)). The party challenging the findings has the burden of demonstrating that they are not supported by substantial evidence. *Id.* We will not disturb the trial court's assessment of witness credibility or consider the strength of the evidence. *In re Det. of A.F.,* 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021). "[W]e review the evidence in a light most favorable to the petitioner." *In re Det. of K.P.*, 32 Wn. App. 2d 214, 221, 555 P.3d 480 (2024), *review denied*, No. 103607-8 (Wash. Mar. 4, 2025).

RCW 71.05.240(1) directs the trial court to hold a probable cause hearing after a petition for 14 days of involuntary treatment is filed. RCW 71.05.240(4)(a) further provides that

> at the conclusion of the probable cause hearing, if the court finds by a preponderance of the evidence that a person detained for behavioral health treatment, as the result of a behavioral health disorder . . . is gravely disabled, and, after considering less restrictive

alternatives to involuntary detention and treatment, finds that no such alternatives are in the best interests of such person or others, the court shall order that such person be detained for involuntary treatment not to exceed 14 days in a facility licensed or certified to provide treatment by the department or under RCW 71.05.745.

Pertinent here, "gravely disabled" is defined as

a condition in which a person, as a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for [their] essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over [their] actions and is not receiving such care as is essential for [their] health or safety.

RCW 71.05.020(25). Although the State pursued a theory based on harm to others and grave disability, as defined by both subsections (a) and (b), the trial court concluded only that K.B.'s mental health disorder resulted in her grave disability, specifically a "severe deterioration in routine functioning" as set out in subsection (b).

The trial judge's findings relied on the testimony of Cisneros, who established K.B.'s baseline and presentation at the emergency room, and Yen, who relayed K.B.'s course of treatment and behavior at Fairfax. Crucially, Cisneros provided a contrast between K.B.'s baseline at discharge following a prior course of treatment and her presentation during her admission at the emergency room. When K.B. was discharged in August 2024, her behavior was described as "cooperative," her mood was good, she was not experiencing any hallucinations, and she had proper insight into her disorder and her need to continue treatment. Cisneros' testimony detailed K.B's deterioration just a few months later as exhibited during her emergency room visit where she was combative, aggressive

with staff, and responded to internal stimuli. Yen then provided further contrast between K.B.'s baseline and how she presented during her time at Fairfax; although there was improvement, K.B.'s functioning was still below the level present in August. This is "recent, tangible evidence" of grave disability, which is sufficient to justify involuntary treatment under the ITA. *See LaBelle*, 107 Wn.2d at 204.

K.B. contends that the State did not present sufficient evidence to establish her baseline, but again, even if the evidence was limited, the contrast between K.B.'s condition in August and in October was significant. The trial court conceded that the evidence regarding her baseline was "not extensive" but also noted that the description of K.B. at the time of her August discharge "was of someone who could engage, in discharge planning, who could hold a conversation[,] who was not hostile, was showing essentially normal speech and interactions," was not delusional, "and had some plans on being able to obtain further treatment in the community." Additionally, even if K.B's deterioration may have been exacerbated by a variety of external factors, as she contends in briefing, she was unable to navigate the process safely on her own to utilize available resources for support and, thus, was returned to the emergency room in the condition described, *supra*. At the time of the hearing on the 14-day petition, K.B. did express a desire and knowledge of how to obtain help after discharge, but the trial judge did not find her testimony credible. We do not revisit the trial court's credibility determinations or reweigh the evidence. *A.F.,* 20 Wn. App. 2d at 125. The testimony that established K.B.'s deterioration from August to October, the evidence relied on by the trial court

for its commitment order, was sufficient to support its findings of fact and ultimate conclusion that she was gravely disabled and required continued involuntary treatment.

Affirmed.

WE CONCUR: